Lowell v. The People.

Wallace A. Lowell v. The People of the State of Illinois.

Gen. No. 12,444.

1. CONSPIRACY—*when crime of, complete.* This offense is complete under the common law and under our statute when the unlawful combination is made and parties to the conspiracy may be prosecuted therefor whether they are proved to have committed overt acts in pursuance of the unlawful combination or not; such parties, likewise, can be prosecuted for conspiracy when overt acts have been actually committed in pursuance of the unlawful combination.

2. STATUTE OF LIMITATIONS—*when does not bar criminal prosecution for conspiracy.* The Statute of Limitations does not bar a criminal prosecution for conspiracy where the original combination was made at a time so far antedating the incident as to be of itself within the bar of the statute. The statute begins to run with respect to the combination at the time the combination is made but the statute begins to run afresh from the time of the commission of the overt act.

3. ARGUMENT OF COUNSEL—*when will not reverse.* Extravagances in argument and statements outside the record, if not prejudicial, will not reverse.

Criminal prosecution for conspiracy. Error to the Criminal Court of Cook county; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Affirmed. Opinion filed January 15, 1907.

**Statement by the Court.** This is a writ of error prosecuted from the sentence of the Criminal Court of Cook county. Plaintiff in error, hereafter called

defendant, was by a jury found guilty of conspiracy as charged in the indictment. He was sentenced to imprisonment in the penitentiary for an indeterminate period and to pay a fine of $1,000.

The indictment contains two counts and charges in substance that the defendant and one Walter M. Cowell conspired and agreed together with the fraudulent and malicious intent to obtain money and property of one Nelson R. Jackson by false pretenses and to cheat and defraud the latter. At the trial Cowell, the other defendant, pleaded guilty and testified as a witness for the state.

The record is voluminous, the trial having continued, it is said, through twenty-seven days. There is evidence tending to show a state of facts as follows: The defendants, Lowell and Cowell, combined to engage in what is called "wild cat insurance," and in 1901 made an arrangement for promoting insurance for that purpose. A concern known as the Wisconsin Insurance Agency Company was organized. This company appears to have been made use of to secure applications for insurance upon which policies were issued in the names of one or another of the fraudulent insurance concerns which the defendants industriously formed or promoted under its charter. In this way the agency company obtained an extensive business, procuring the issue of from twenty-five to seventy-five of these policies a day. Out of about forty of the losses only two, it is said, were paid, one of these for $4.50 and one for $62. It was apparently not intended that losses should be paid, but the purpose was to obtain premiums collected upon worthless policies issued by the fraudulent insurance concern of defendants' creation or promotion. In order to give a plausible appearance of legitimate business to the transactions defendants caused the publication of statements from time to time showing assets and liabilities of the supposed insurers or their underwriters. As illustrations of the methods used, the

"Underwriters of the Union Lloyds of Illinois" were represented to be capitalized at $316,267.74, with no liabilities; and the total assets of "The United Fire Underwriters" were represented at $33,979.64, liabilities none; whereas the testimony of the defendant, Cowell, is to the effect that these alleged assets were valueless, consisting as he says of "hot air and blue sky," which he explains to mean "that they looked all right on their face but were not worth much." The underwriters were dummies stuffed with worthless so-called assets, to make them appear as millionaires and give an appearance of wealth and respectability to the fraudulent insurance concerns promoted by defendants. One of these underwriters was Cowell's clerk, another a molder, a third a plumber, and all were alike irresponsible. When one of them was not available, affidavits needed were prepared to which their names were signed for them by Cowell, who also affixed his own seal and signature as notary public.

By means of this character the defendants and the Wisconsin Insurance Agency Company, with its fraudulent companies and its irresponsible or "dummy" underwriters were enabled to dispose of many worthless policies upon which they collected premiums from deluded policy holders. Nelson R. Jackson mentioned in the indictment was one of these policy holders.

M. L. THACKABERRY, for plaintiff in error.

JOHN J. HEALY, State's Attorney, FRED L. FAKE and F. L. BARNETT, for defendant in error; FRANK M. FAIRFIELD, of counsel.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

The principal contention of defendant's attorney is that if the crime was committed at all it was com-

mitted more than eighteen months prior to the in-
dictment, and was therefore barred by the Statute of
of Limitations, R. S., chap. 38, sec. 316. It is argued
that the statute began to run at the time in 1901 when
the conspiracy was formed without reference to overt
acts thereafter committed more than eighteen months
later in pursuance of the conspiracy. This conten-
tion is thus stated: "We insist that when the policy
was issued and the first payment was accepted the
Statute of Limitations began to run and even if Jack-
son had paid one dollar to Lowell, as he testified, and
Lowell had put the amount in his book, clearly it was
beyond the Statute of Limitation." The payment re-
ferred to was made by Jackson in October, 1902, and
was a payment on account of premium upon a fraudu-
lent policy of insurance issued, as the indictment
charges, to obtain money by false pretenses. In sup-
port of his contention defendant's attorney cites from
pp. 590-1, vol. 4, of A. & E. Ency. of Law, 1st ed'n
which in part is as follows: "A conspiracy is a sub-
stantive offense, and is punishable at common law,
though nothing be done in execution of its purpose.
The offense is complete when the confederacy is
made; and an act done in pursuance of it is no part
of the offense, which is in fact punished to prevent
the execution of the act proposed to be done. The
original corrupt agreement is itself the offense; and
overt acts done in pursuance thereof are mere matters
of aggravation and not necessary to the consumma-
tion of the crime;" and further that "the conspir-
acy and consummation are separate and distinct of-
fenses in the sense at least that the fact that the of-
fense has been completed is no legal bar to the prose-
cution for the conspiracy;" citing also from McClain
on Criminal Law, vol. 2, sec. 966. The offense doubt-
less is complete under the common law and our stat-
ute when the unlawful combination is made, and
parties to the conspiracy may be prosecuted therefor
whether they are proved to have committed overt acts

in pursuance of the unlawful combination or not. They can likewise be prosecuted for the conspiracy when overt acts have been actually committed in pursuance of the unlawful combination. It does not, however, follow that prosecution is barred by the Statute of Limitation because the original combination was made at a time so far ante-dating the incident as to be itself within the bar of the statute. In Ochs v. The People, 124 Ill. 399, 426, this question is considered. Certain commissioners of Cook county were tried and convicted under an indictment containing counts charging that the defendants and others feloniously conspired together, with the fraudulent and malicious intent by false pretenses to cheat and defraud the county of Cook of its moneys, etc. As to two of the defendants it appeared that the bar of the statute applied to all acts committed by them prior to October 3, 1885, which was about two months before their terms of office expired. The court says: "The existence of the conspiracy prior to October 3, 1885, having been satisfactorily established, as we think it was, it is necessary for the avoidance of the bar of the statute to inquire whether there were any overt acts in furtherance of the conspiracy committed by the defendants subsequent to that time. We think the proof of the commission by all the defendants of such overt acts subsequent to October 3, 1885, is abundant." In commenting upon an instruction which it was complained in behalf of the defendants had been erroneously refused, the court further said: "The first instruction as to all the defendants was faulty and misleading in telling the jury that the crime of conspiracy was complete and the offense was then committed when the agreement or confederacy was entered into and that the period of limitation would commence to run from the time of committing the offense. The instruction was calculated to lead the jury erroneously to think that the period of limitation would commence to run from the time a defendant first became a mem-

ber of the conspiracy, instead of from the time of the
commission of the last overt act in furtherance of the
object of the conspiracy.''

It is to be borne in mind that prosecutions for con-
spiracy in the federal court are not brought under the
common law but under a federal statute which differs
both from the common law and from the statute of
this state.   The federal courts do resort to the com-
mon law in the interpretation of criminal federal
statutes, but not as a source of jurisdiction.

In *Ex parte* Black, 147 Fed. Reporter, 832-837, the
act of Congress relating to conspiracy is considered,
and it is said that it ''introduced a radical change in
the law of conspiracy when it incorporated Section
5440 into the statute.   At the common law a conspir-
acy was ripe when the  secret agreement  had been
reached by and among the conspirators.  *   *   *   The
policy of Congress was not to introduce a new element
into the crime, but to allow a period of grace, an op-
portunity for repentance after the plot had been per-
fected and before any decisive act had been done in
furtherance of it.   Therefore the courts are required
to differentiate sharply between the agreement *per
se* and acts in furtherance of the agreement.   During
all such time and until some act has been done to ef-
fect the purpose—some overt act—the parties may
abandon the conspiracy and be held guiltless of the
offense.''   It appeared in that case that ''at the date
of the earliest alleged overt act the conspiracy laid in
the indictment had been consummated.''   It was there-
fore held that the action was barred by the Statute
of Limitations.   To the same effect is United States
v. McCord, 72 Fed. Rep. 159, 163, where it was said:
''Now it seems to me the material  question  in this
case is when the Statute of Limitations commenced to
run, whether these defendants might have been indicted
under the evidence of this conspiracy in the spring of
1891, and that they might seem to me quite clear from
the testimony.''   It was held that the action was there-

fore barred by the federal statute. The law of Illinois contains no such provision as appears in the federal statutes and in the statutes of some of the states that in order to complete the offense of conspiracy there must be some overt act. Under our statute it is sufficient that the unlawful combination has been formed. R. S., chap. 38, sec. 46. Cases therefore in the federal courts and in states having statutes similar to the federal statute in this respect are not in point in this state. It is said in *Ex parte* Black (*supra*, p. 840), that "an overt act presupposes a pending conspiracy, so that the act of any one done in furtherance of the conspiracy may bind all of his associates. When a conspiracy has been completely effected this implied agency disappears (citing cases). It is a contradiction of terms to speak of an act done to effect the purpose of the conspiracy after the conspiracy has been accomplished. Such an anomalous doctrine might prolong a conspiracy, and would keep it in active operation until every obligation incurred during the formative period of the plot had been liquidated;" and it is said "where would be the *locus penitentiae* in such case." These extracts will sufficiently show the distinction made in the federal courts under the federal statute, and why those cases are not applicable in our state. Here there is no provision of the statute for a *locus penitentiae* after the unlawful combination has been formed and before it has been followed by an overt act. The original conspiracy is an offense of itself. It would seem to be sound common sense as well as good law in this jurisdiction that each overt act by which the conspiracy becomes effective should be deemed a renewal of the original conspiracy. Otherwise, under our statute, parties might effect an unlawful combination to obtain money by false pretenses as in this case, make all their preparations to carry into effect on a large scale the unlawful scheme, postpone its actual operation eighteen months from the formation of the conspir-

acy and then go on fleecing the community with impunity under protection of the Statute of Limitation. What is said in McKee v. The State, 111 Ind. 378, is directly in point: "After the joint design was once fairly established, every act done in pursuance of the original purpose, whether by one or more of the conspirators or by their agent, was a renewal of the original conspiracy." To hold otherwise in this State would be not only contrary to the law as stated by our Supreme Court, but would exalt a technical objection in favor of the law breaker to the dignity of a substantial and just defense. We are of opinion that the evidence sufficiently justifies the finding that defendant Lowell was actively participating in the fraudulent combination at the time of the overt act charged in the indictment.

Objection is made that incompetent evidence was in some cases admitted over objection. We are inclined to think that some of the documentary evidence admitted might properly have been excluded. But we are of opinion that the erroneous admissions were not and could not have been prejudicial in view of the great mass of competent evidence which convincingly sustains the verdict.

It is urged that when the conspiracy was executed the offense merged into a felony, thus making the indictment for conspiracy, which is a misdemeanor, incapable of supporting a conviction. It is sufficient to say that under our statute the offense of conspiracy to obtain money by false pretenses is punishable either by fine or imprisonment or both, and the indictment supports the conviction.

Objection is made to certain instructions on the ground generally that they are not warranted by the indictment or by the evidence, but without pointing out any specific or material error in these respects, and we discover none. Complaint is made that the state's attorney went outside the record in his address to the jury, but it is not shown wherein the al-

leged improper remarks were injurious. We find some extravagant expressions, and some statements which it is said there was no evidence to sustain. When objection was made on this ground the trial judge who had heard the evidence did not seem to regard the objection as well taken, saying that the jury had heard the testimony. We find nothing in the remarks referred to which would justify interference with the verdict.

Upon careful consideration of the whole record we find no material error and the judgment of the Criminal Court must be affirmed.

*Affirmed.*